EASTERN DIST.
*April*, 1832.

PERCY ET AL.
*vs.*
MILLAUDON
ET AL.

The Mayor of the city of New-Orleans may order the demolition of works and buildings which impede or interrupt the use of a passage along the river in places to which the public have a right of way.

---

## PERCY ET AL *vs.* MILLAUDON ET AL.

APPEAL FROM THE COURT OF THE FIRST DISTRICT.

The making of discounts, under the charter of the Louisiana Planters Bank, was an operation requiring an act of the board. It could not therefore, be committed to any agent or agents of the board.

The direction had no authority to reduce the capital.

Directors, apprehensive of a suit from the stockholders, could not legally appropriate money of the bank to the fee of counsel.

Prescription may be pleaded in the Supreme Court, at any time before final judgment.

EASTERN DIST.
*April*, 1832.

PERCY ET AL.
vs.
MILLAUDON
ET AL.

Directors of a bank, are personally responsible for damages resulting to the bank, from their acts or neglect, and the measure of damages, is the extent of the injury.

In Louisiana, they are responsible for their *virile* share only, and not *in solido*, but they are not responsible for an error of judgment, when duty compels them to choose between difficulties, and the case is one, in which doubts may be reasonably said to exist. But when the error is gross, the necessity not apparent, and the consequences fatal, they are answerable.

The facts are fully stated in the opinion of the court, delivered by *Martin, J.*

This cause derives much more importance from the novelty of the question in controversy, and the magnitude of the claim against the defendants, than from the intricacy of any point of law arising in it.

In April, 1811, a number of individuals, who had associated for the purpose of establishing a bank, in this city, obtained from the legislature of the late territory, an act incorporating them, under the style of the Planters' Bank of Louisiana. The capital, which was limited to six hundred thousand dollars was not at that time wholly subscribed for, but was afterwards nearly taken up. The period between the date of the charter and the latter part of the year 1819, when the cashier disappeared, though partially one of considerable mercantile embarrassment, was for the institution, one of successful experiment. Yet, in the winding up of the affairs of the bank, which soon after became a measure of necessity, a frightful deficiency of funds was discovered : a quantity of the bank notes remained unredeemed, and the claims of several creditors of the corporation unsatisfied, after the absorbtion of the capital. That this should have excited considerable dissatisfaction among the stockholders, and that some of them thought of resorting to a legal inquiry into the causes of so disastrous a result, is not surprising ; this was not however, attempted for several years after, when Millaudon, Lanna and Abat, were, in 1825, selected as the persons, to whose conduct, it was imagined, the misfortunes of the corporation could be traced : but the suit, which was then

72

EASTERN DIST.
April, 1832.

PERCY ET AL.
vs.
MILLAUDON
ET AL.

instituted against them, failed on a technical objection. 3 *Martin, N. S.* 476.

In May, 1827, the present suit was commenced by the stockholders, who were plaintiffs in the former suit, and others, owners of four hundred and thirteen shares, against the same defendants and such other stockholders, (as declined to become plaintiffs) owners altogether of three hundred and sixty-four shares, which, with those owned by the plaintiffs, constituted the whole remaining stock of the bank, at the expiration of its charter, in 1826.

Relief was sought against the three defendants above named, only. Their co-defendants being made parties to the suit, for no other purpose, than that of having all the stockholders in court.

The declared object of the suit, was to obtain a liquidation of the affairs of the bank, and a division of what might remain, after its passive debts were discharged. As a preliminary step, after charging these defendants, with a number of illegal and fraudulent practices, as directors, the plaintiffs prayed that they might be decreed to bring into court, a sum of nearly one million of dollars, of which the petition alleges, the bank sustained the loss, through these practices; and general relief was prayed.

These three defendants pleaded the general issue. The others declared themselves utterly ignorant of all and any of the charges against their co-defendants, and avowed their satisfaction, that the court should thereon, do whatever justice should appear to require.

The case was heard in the District Court, where the plaintiffs failed; they appealed—and at May term, 1829, we deemed it our duty, to remand the cause for a new trial, after having laid down the principles, which we thought ought to govern it. 8 *Martin, N. S.* 68.

The plaintiffs were not more successful on the second, than on the first trial, and have brought up the judgment of the District Court for our revision.

We have been very powerfully aided, by the exertions of the counsel on each side, during a hearing, which has been protracted to the eighteenth day.

We have to lament a great inconvenience resulting from the manner, in which the facts of a case are brought before us, under our present system of practice. The statement of facts has informed us, that all the books and papers of the bank, were given in evidence below. This has enabled either party, to draw our attention to any line of any book or document on the files, without showing, it had been made use of before the first judge; and the counsel of the appellees, to whom this adverse decision, was particularly to be dreaded, on the score of injury to their feelings and reputation, has complained, that the opposite party, considering the trial in the inferior court, merely as a stepping stone to this tribunal, deemed success in the first instance, a matter of no importance, and contenting themselves, with securing the means of developing the most material part of their evidence before us, scarcely took the trouble of displaying any part of it in the District Court, and now present to us, a case bearing very little resemblance indeed, with that laid before our learned brother, whose judgment we are called upon to revise.

EASTERN DIST.
April, 1832.

PERCY ET AL.
vs.
MILLAUDON
ET AL.

It has been our endeavor to afford to the appellees' counsel every opportunity which they have asked, of averting any ill consequence from surprise, and we have listened to them and their opponents, till they both appeared satisfied, they had put us in possession of every fact or argument, to which they appeared to attach any degree of importance.

The illegal and fraudulent practices alleged against the three principal appellees, are:

1. Their assisting the president in making irregular and illegal discounts.

2. And in otherwise irregularly and illegally obtaining large sums of money from the cashier, whereby a considerable part of the funds of the Bank was diverted from its regular and legitimate channel.

3. Their authorising the illegal transfer of a considerable number of shares of the stock to the bank; whereby large sums of money were drawn from its vaults.

4. Their making a false report to the board of directors of the state of the vault, after the disappearance of the cashier.

EASTERN DIST.
*April*, 1832.

PERCY ET AL.
*vs.*
MILLAUDON
ET AL.

5. The illegal cancelling of his bond.

6. Illegal and improper allowances to him and the attorney of the bank.

7. Their neglect to pay the amount of certain shares of the stock subscribed for by them, and to collect that of shares subscribed by others.

The appellants' counsel has urged that by these illegal and fraudulent practices of these appellees, the whole funds of the bank have been dissipated; creditors of the bank to an amount from forty thousand to fifty thousand dollars remain unpaid; the stockholders have been deprived of the dividends they had a right to expect; and on the expiration of the charter, there did not remain one cent of the capital stock.

That the alleged loss was sustained, is admitted to an amount in round numbers of two hundred thousand dollars, without including the loss resulting from the absence of dividends from the first of October, 1819, till the expiration of the charter.

The appellees' counsel has, however, contended that this has been occasioned by the direct and indirect consequences of the indulgence granted by the cashier to the president, by permitting him to overdraw, and by the moneys of the bank being secretly handed by the former to the latter; whereby the corporation sustained a loss of one hundred and twenty thousand dollars; in consequence of which it was for a while compelled to pay usurious interest on large sums, whereby a loss of about forty thousand dollars was superadded, and the corporation was disabled from continuing its operations; and in winding up its concerns, which soon became necessary, the corporation lost a sum of one hundred and twenty thousand dollars, by the purchase and resale of a sugar plantation and slaves, which it was induced to take, in order to secure a doubtful debt.

It has been strenuously pressed upon us that no degree of care and vigilance in the board of directors, nor in any of them individually, could have protected the bank from the consequences of the mal-practices and collusion of two individuals, occupying offices of so high confidence and importance.

Eastern Dist.
*April*, 1832.

PERCY ET AL.
*vs.*
MILLAUDON
ET AL.

It has been replied, on the part of the appellants, that the loss of forty thousand dollars, paid for usurious interest; that of one hundred and twenty thousand dollars on the re-sale of the sugar estate and slaves, were the consequences of the inability of the bank to continue its operations, and the necessity of winding up its concerns; that this inability and this necessity · are attributable to the illegal and fraudulent practices charged in the petition, and not to any improper indulgence granted by the cashier to the president, which the principal appellees could not have easily prevented or guarded against; that the loss by the bank scarcely reached the sum of one hundred and twenty thousand dollars, and would not have occasioned a suspension, much less a close, of the operations of the bank, if its ability to proceed on its affairs had not been greatly diminished by the diversion of its funds for a long period, from their usual, legitimate channel, through irregular and illegal discounts; by the reduction of its capital stock, whereby it ceased to have the means of accommodating its best customers, and their consequent dispersion.

The counsel has contended that this loss of one hundred and twenty thousand dollars might have been reduced to ninety thousand dollars, if, instead of cancelling the cashier's bond, the board had put it in suit, and to seventy thousand dollars, by the exercise of the privilege or lien which the corporation had on the cashier's slaves and land; that this latter sum might soon have been covered by the legitimate profits of the bank, if its capital had remained at six hundred thousand dollars, i. e. in its original integrity. A reduction of the dividends during two or three years would have been all the loss the stockholders should have sustained.

The parties being thus at issue on the charge of illegal and fraudulent practices, it becomes our duty to examine how far the evidence supports them.

I. The first act, which is presented to our consideration, concerns the appellees, Lanna and Abat alone. It appears they were present at, and it is not shown they opposed, a resolution of the board, of the 13th of August, 1817, by which the president and cashier were authorised to discount

EASTERN DIST.
*April*, 1832.

PERCY ET AL.
*vs.*
MILLAUDON
ET AL.

notes which had more than sixty days to run.    On that day, the appellee Millaudon was not present, and the board was composed of the President and three other directors, besides the other two appellees.

On the thirteenth of the same month, the board being composed of the president, these three appellees, and five other directors, the resolution was confirmed.    It was not, however, long in force.    Delacroix, one of the directors, protested against it, and it was rescinded on the twenty-fourth of September following, on the motion of the appellee Millaudon, who, immediately after, presented another resolution, which was adopted; by which the president was authorised to receive and discount drafts and notes offered in the intervals · between the discount days, by consulting three or four directors, the majority of whom (including the president) should agree to the discount.

These two resolutions have appeared to us evident violations of the tenth section of the charter, which declares "the making of discount" to be a business "*which requires* an act of the direction," i. e. an act which the board of directors must itself perform, and the performance of which it cannot, therefore, commit to any agent.    This section further provides, that for the making of discounts, the president and four directors shall be a *quorum*.

*The making of discounts under the charter of the Louisiana Planters Bank, was an operation requiring an act of the board. It could not therefore be committed to any agent or agents of the board.*

The *direction* is the board of directors of a bank, i. e. the meeting of the president personally, or by representation, and the legal number of directors to constitute a *quorum*, at a time when, and a place where every other director has the faculty of attending to consult and be consulted with.

While the act of incorporation provides, that there shall be eleven directors, for the management of the affairs of the bank, while it describes certain acts as requiring an act of the direction, and specifies what number of directors shall, with the president, constitute the direction; the right cannot certainly be conferred by the board, on the president, *to select* any number of directors at his choice, and consequently to exclude the others, as his associates in the formation of a board, to act on any business, which requires an act of the direction.

EASTERN DIST.
April, 1832.

PERCY ET AL.
vs.
MILLAUDON
ET AL.

Every director, present at a board, is responsible for any act of it, for which he votes, or which he does not oppose, and in the latter case, for all the injurious consequences of the act, which he does not fairly labor to avert.

Every absent director, is equally responsible, in case of extreme neglect in his attendance at the board, or in case, after the act comes, or must have to come to his knowledge, had he used due diligence, he does not labor to avert its injurious consequence.

If the president may conceal from the board, or from any of the directors, any part of the affairs of the bank, on which the board ought to act, he may deprive the corporation of the security resulting from their responsibility.

The resolution of the 13th of August, placed the whole funds of the bank, at the disposal of the president and cashier, and that of the 24th of September, at that of the former officer and any two directors he might select; for after he and they had determined on the discount of a note, a consultation with one or two other directors was a mere farce.

The counsel for the appellees has, however, endeavored to justify these resolutions, by the practice which he contends, exists if not in all, at least, in a great majority of the banks in these states, (and is coeval with the first creation of these monied corporations among us) to commit the discount of bills of exchange and promissory notes, to the president and cashier, either of these officers, or a committee of directors.

This practice, as far as it relates to bills of exchange, not payable at home, has been admitted by the counsel of the appellants, but denied as far as it relates to promissory notes.

*Discount*, in banking operations, is a technical expression, used to denote that, by which a bank acquires the property of a promissory note, or a bill of exchange, payable at home. In these states, it is by far, the most important and the most common of the operations of a bank, and that through which (with a very few exceptions indeed) loans are exclusively obtained from any of these institutions.

If there be cases, in which our banks acquire the property of a promissory note or bill of exchange, payable at home,

Eastern Dist.
April, 1832.

PERCY ET AL.
vs.
MILLAUDON
ET AL.

otherwise than by discount, by paying the nominal amount, they are exceedingly rare; and those taken to secure a doubtful debt, presents perhaps the only exception.

When a bank has obtained the property of a note or bill of this kind, it does not sell it, but suffers it to sleep in a port-folio till its maturity, when it is drawn out for collection.

So, the *dealing* of a bank on promissory notes and bills payable at home, is confined to the *discount,* or at least that is its principal operation on such paper.

But, banks *deal* in bills of exchange payable abroad; this is true, but this dealing consists in *buying* and *selling*, and is, therefore, thus called in banking language, and in many cases the word *discount* is utterly inapplicable.

If the bill be on a place, in favor of which, the balance of trade is, with respect to that in which it is offered for sale, the bank has a *premium* or advance to pay. The buying is not therefore, a *making* of discount; a business for which, the charter requires an *act* of the direction.

The rule is the same, if the bill be bought at par.

In both these cases, as there is not any making of discount, the *buying* may perhaps be committed to an agent, for nothing in the charter prohibits it.

If the balance of trade, be in favor of the place where the bill is offered for sale, the bill may be bought *below par* and the word discount may correctly be, though it is not generally used, to denote the operation.

The dealing of a bank in bills of exchange, is not confined to the *buying* of them. Though the bank at times, send them for collection, it frequently *sells* them. To this last operation, the word *discount* is not more applicable than to the first.

On the establishment of banks in these states, the buying and selling of bills of exchange *at* or *above* par, being deemed an operation, which could not be called a *making* of discount, and the buying and selling of bills generally, being considered as an operation, which requires more information than the *discount* of notes, was ordinarily committed to one or several persons possessing the requisite information, and it was concluded, that if they could be intrusted with the buying at or

above par, it must follow they could be so, when they purchased on terms more advantageous to the bank, i. e. *below* par, an operation to which the word discount was certainly applicable; the distinction was disregarded, and it is believed, the practice has generally, if not universally prevailed, as stated by the appellees' counsel, and admitted by that of the appellants.

Eastern Dist.
*April*, 1832.

PERCY ET AL.
*vs.*
MILLAUDON
ET AL.

We are not now called upon to say, whether the practice of buying bills of exchange payable abroad at, below par, or on a discount, be legal or otherwise, but whether it authorised the resolutions of the 13th of August and the 24th of September, under consideration, and we have no hesitation in saying, it did not : if it did, the part of the tenth section of the charter, which requires the presence of the president and four directors, for a *quorum;* on the making of discount, is without a meaning, as a smaller number, the president alone, or any agent, might be authorised *by the board to make discounts,* although the charter declares this to be a business which requires an act of the direction.

The counsel for the appellants has urged, that the resolution of the 24th of September, 1817, presents an evident instance of corruption, fraud and collusion, between the president and these three appellees.

It is said, nothing induces the belief, that the interest of the bank suggested it ; and the use which the president and two of the appellees made of it, for their private advantage, authorises the charge against them.

It is not pretended that the bank was embarrassed with an excess of funds, to the disposal of which two discount days were insufficient. Had that been the case, the addition of a third day would have rendered every other day of the week a discount day. On the contrary the evidence shows the bank labored under a penury of funds.

The counsel have insisted that the sole object of the resolution was to afford the president and directors the faculty of procuring money at any hour. This officer and these three appellees, made the most ample use of it, and if, in any instance, any individual out of the board was benefited by it, such accidents were very rare indeed.

73

EASTERN DIST.
April, 1832.

PERCY ET AL.
vs.
MILLAUDON
ET AL.

The counsel has produced evidence that the president and the directors whom he consulted, absolutely disregarded, in the making of discount, all the provisions by which the by-laws had endeavored to prevent the misapplication of the funds of the bank.

They violated the by-law, which confined discounts to notes having no more than sixty days to run; discounting notes due at a more distant period to the amount of one million sixty-four thousand and sixty-four dollars and forty-four cents; one hundred and sixty-seven thousand two hundred and seventy-five dollars and eighty-seven cents, of notes which had more than four months to run.

Notes to the amount of forty-two thousand and two dollars and eleven cents, which had been rejected by the regular board, were afterwards and the same day discounted at the irregular one.

Our attention has been drawn to the amount of notes discounted; under the resolution of the twenty-fourth of September, 1817, from April 3d, 1818, to the 19th of October, 1819, a period of about eighteen months; the amount is one million seven hundred and seventy-nine thousand seven hundred and eighty-five dollars.

Or, in round numbers...................................$1,780,000

Of this amount, the notes discounted for the president are, in the same numbers,.............$840,000

    Those for the appellees:

Millaudon, .......,................................. 284,000
Lanna,.............................................. 142,000
Abat, ................................................ 20,000

The president and appellees,.............$1,286,000
Discounted for Sagory, a director...... 183,000
           White,     do.   ...... 96,000
           Laronde,   do.   ...... 44,000
                            ————$1,609,000

Leaving for the four remaining directors, the other stockholders and the public,........................ 171,000

EASTERN DIST.
April, 1832.

PERCY ET AL.
vs.
MILLAUDON
ET AL.

Thus out of every hundred dollars thus discounted, the president had.................................................................47

    The appellee Millaudon,............................................16

        do.   Lanna, ................................................. 8

and   do.   Abat,..................................................... 1

    The president and appellees, ...................................72

Sagory, ...................................................................10

White,..................................................................... 5

Laronde,.................................................................. 2

And the four remaining directors, other stockholders and the public,.........................................................11

                        100

The counsel of the appellants has insisted that he has established this first charge of illegal and fraudulent practices and collusive aid given to the president to dispose of the funds of the bank, in contravention of the provisions of the charter.   They say that the use of illegal means to procure an advantage, to him who resorts to them to the injury of another, constitutes a fraud, which is much aggravated when the injured party had placed his trusts and confidence in him who seeks his own advantage.

We have said the practices on which this first charge is based were *illegal*.

But the appellees' counsel has replied that it is not denied and even it is manifest, that every note which was discounted by the president for the benefit of any of these appellees was most punctually paid, and that the counsel of the appellants has not been able to show that any note thus discounted for any other person is still due.

This is true ; yet we are unable to say that the resolution of the twenty-fourth of September was a measure, which men of ordinary prudence, could have considered as being called for, by the interest of the bank.   Indeed from the use, which two of these appellees particularly made of it, it is not easy to avoid the conclusion, that the vote they gave on it,

EASTERN DIST.
April, 1832.

PERCY ET AL.
vs.
MILLAUDON
ET AL,

was much influenced by a view to promote the interest of a few individuals.

The diversion of the funds, which the president was thus allowed to make, must necessarily have much cramped the operations of the regular board—the fair and legitimate channel, through which the public had a right to deal with the bank was thereby obstructed, and it is difficult to resist the conclusion of the counsel of the appellants, that the customers of the bank must have carried their deposites and their papers for collection to rival institutions, in which none of the directors had the faculty of forestalling them.

The resolution, in our opinion, gave the first blow to which the subsequent ruin of the bank is principally attributable.

II. When the case was first before us, it was proven that the cashier had secretly advanced to the president large sums of money on his unendorsed notes, and at times permitted him to overdraw, but we thought there was not the least scintilla of evidence that the appellees, or either of them had any knowledge of this collusion, between the two principal officers of the bank, at the time, nor at any period since, till the disappearance of the cashier, and as the appellants have not adduced any new evidence on this point during the second trial, we concluded that this charge is unsupported.

III. These appellees are next charged with concurring in the illegal transfer of a large number of shares, to the amount of one hundred and sixty thousand dollars at par, at a period when the stock was considerably below par, and with otherwise reducing the capital of the bank, thereby cramping its operations, and thus contributing in a great degree to disable it from continuing its discounts, after the failure of the president, and compelling it to close its concerns, after resorting to usurious loans, an operation which caused an immense loss.

As early as in 1813, the board directed the purchase of twenty thousand dollars of stock at twenty per centum below par. Soon after two shares were taken from a debtor who was unable to pay otherwise; and in the latter part of that year stock was directed to be bought at not more than ten per centum discount, so as to reduce the capital to two hundred

thousand dollars.  In April, 1815, this had been effected so far as to reduce it to two hundred and twenty-five thousand dollars, shares having been purchased to the amount of two hundred and one thousand eight hundred dollars.

Matters were in this situation, in the beginning, in 1818, when a number of stockholders, dissatisfied with the conduct of the party who had gained the ascendancy, solicited from the board the permission to subscribe for shares, so as to bring the capital to the maximum of the charter.  This being refused, the applicants procured from the Court of the First District a writ of *mandamus* for the opening of the subscription books ; their object was, however, defeated, by a subscription for the whole shares, by the directors, who afterwards distributed them among the stockholders, in proportion to their respective interest in the capital; whereby the relative strength of the party who had the ascendancy, and that in the opposition, was prevented from being altered.

On the third of April, 1819, the board (the appellees Millaudon and Lanna being present) came to a resolution, that *considering the scarcity of specie*, the president be authorised to purchase stock not above par : the capital not to be reduced to less than two hundred thousand dollars.

Between the date of this resolution and the month of October, some stock was purchased, particularly shares from the appellee Lanna, to the amount of nine thousand dollars.

On the first of that month, shares to the amount of three hundred thousand dollars, one-half the amount of the maximum of the capital, were owned by individual stockholders.

By a statement, which the cashier made on the eighth of that month (eight days before he disappeared) it appears that stock to the amount of seventy-five thousand dollars had been purchased on account of the bank, during the preceding week, and that he held the appellee Lanna's note, representing stock to the amount of twenty-five thousand dollars, which, added to the former sum, made that of one hundred thousand dollars, and reduced the capital to two hundred thousand dollars, the *minimum* of the resolution of the third of April preceding.

EASTERN DIST.
*April*, 1832.

PERCY ET AL.
*vs.*
MILLAUDON
ET AL.

The *scarcity of specie* given in that resolution as the reason which induced the purchase of stock, would, in our opinion, have better supported the opposite measure ; and the disposal of one hundred thousand dollars (at the eve of the disappearance of the cashier) in the purchase of stock cannot be easily accounted for on any satisfactory ground.    Neither the president, nor the cashier, can be supposed to have been ignorant, at this period, of the impending ruin of the bank, and they own, that, in such a crisis, these officers should have actually paid out money to the amount of one hundred thousand dollars, for purchase of stock, not only absolutely necessary, but the direct and speedy consequence of the purchase of which must have been the ruin of the institution, is very difficult to be believed.

It appeared more than probable that the persons, whose stock was then obtained, had previously been indulged with the advances by the cashier.    The presumption, that there had not been a fair and *bona fide* purchase of shares, was strengthened by the cashier's statement that the appellee Lanna's note for twenty-five thousand dollars, was in the vault to represent stock to that amount.    This admitted but two explanations : either that the cashier had secretly handed money to Lanna to that amount, and was willing to consider the note as representing stock, or money advanced on a bargain for the purchase of stock, to be transferred to the bank at a future period.    In either case, the conduct of these two individuals was equally reprehensible.

The evidence left us absolutely in the dark, as to the persons from whom, the terms on, and the periods at which, the other seventy-five thousand dollars of stock were procured. Leaves, cut out from the transfer book, left a chasm which no part of the evidence in the record enabled us to fill.

The counsel for the appellants urged that this stock had been transferred by the appellees, or some of them.    In this uncertainty, we concluded that justice demanded that we should remand the case, with the view of enabling the parties to produce such evidence as might throw more light on this transaction.

EASTERN DIST.
*April*, 1832.

PERCY ET AL.
*vs.*
MILLAUDON
ET AL.

The appellants have improved the opportunity offered to them, and have placed on the record a detail of the stock purchased by the bank from the twenty-ninth of June, 1819, to the fifteenth of October following, amounting to seven hundred and ninety-three shares, or one hundred and fifty-eight thousand six hundred dollars.

From the 29th of June to the 29th of July, the transfers are thus :

| | | |
|---|---|---|
| By the president, .................................... | 25 | shares. |
| The appellee Lanna, ............................. | 45 | do. |
| Sagory, a director,................................. | 45 | do. |
| The cashier and his son, ...................... ..| 138 | do. |
| | —— 253 | shares. |

From the first to the 15th October, 1819 :

| | | |
|---|---|---|
| The president,................................................| 155 | do. |
| Cashier, .......................................................| 95 | do. |
| The appellee Millaudon,................... .....| 125 | do. |
| Lanna, ......................................... ........| 125 | do. |
| | —— 500 | shares. |

Or, $150,600.......................................753

Seventy-five of these shares, transferred by the appellee Millaudon, stood on the books of the bank as the property of Morant, an absentee, and were transferred by the appellee Millaudon as his agent, and the counsel of the appellants have strongly urged, though they have satisfactorily proven, that these shares were this appellee's property.

Some of the shares transferred by the president, cashier and the appellee Lanna, stood on the books of the bank as the property of other persons, but have been satisfactorily proved to have been the transferror's property.

The appellants' counsel has presented to us, as a circumstance from which a presumption results, that the last transfer of one hundred thousand dollars, or five hundred shares, at the eve of the cashier's disappearance, was in consequence of an understanding between the president, cashier and the appellees, Millaudon and Lanna; the transfer was made, one-half by the president and the cashier, his protegee, and

one-fourth by each of these two appellees ; the president and cashier two hundred and fifty shares, Millaudon and Lanna two hundred and fifty.

The appellees' counsel has endeavored to justify or excuse the reduction of the stock to the third of the capital, in its original integrity, as a *dealing in stocks* of the public funds, under the twelfth section of the act of incorporation, and the practice of former boards, soon after the beginning of the operation of the bank, and before any of the principal appellees was appointed a director.

The section relied on, provides that " the corporation shall not directly or indirectly, deal or trade in any thing, except promissory notes, bonds, bills of exchange, mortgages, gold and silver bullion, specie, houses, lots, lands, *stock in the public funds,* pledged for money lent, or in the produce of such houses and lands."

The French text, which appears to have been the original, is somewhat different : " *la dite corporation ne pourra directement ni indirectement faire d'ature commerce que celui des billets à ordre, obligations, hypothèques, lettres de change, or ou argent monnoyé ou non monnoyé, ou celui de la vente des biens, terres, actions dans les fonds publics, ou effets engagés pour de l'argent prêté, ou encore celui des profits des dits biens et terres.*"

It is clear, that in order to make the English text conformable to the French, the words, *or in the sale of* should have been inserted immediately after the word *specie,* so as to *disallow* the corporation's *purchase* of houses lands and *stock in the public funds.*

Be this as it may, the act of incorporation, was granted by the legislature of the the territory of Orleans, to the laws of which obedience is due, in whatever language they may have been passed, and no part of the prohibition, in the French text, can be disregarded, because it is not repeated in the English text ; that which is the most extensive must be carried into execution, so that every word used by the legislature may have its effect.

We are, therefore, bound to say, that the charter of the corporation inhibited the *purchase* of stock of the public funds

by the bank, and authorised it to deal *in the sale* of public funds, pledged for money lent.

This conclusion, renders it unnecessary that we should inquire, whether the words *public funds*, as used in the charter, include any thing but government securities, to the exclusion of shares in monied corporations, as *banks*, insurance companies, and the like.

The reduction of the capital of the Planters' Bank, has been attempted to be justified or excused, by the counsel of the appellees, under the practice of the board, almost immediately after it began its operations, and before any of their clients had been appointed a director. If such a justification or excuse, could be found in this anterior practice, the appellees would have had the benefit of it, for this practice has been proven : but a consideration of the consequences of this reduction, has fixed upon us the conclusion, that this plea of justification or excuse, cannot be sustained.

<div style="text-align:right">The direction had no authority to reduce the capital.</div>

Directors of a bank, have important duties to perform towards its creditors and customers, the public and the stockholders.

Creditors and customers, have a claim to the preservation of the capital in its original integrity : for it is the pledge, on the faith of which they accept the notes of the institution, deposite their money, and lodge paper for collection.

So has the public, on account of the advantages which the legislature has stipulated the bank should afford, as a consideration for the immunities and privileges which the charter confers. So have the stockholders, on account of the profits, which they have a right to expect, on the investments they have respectively made. Thus, by the reduction of the capital, the directors of a bank violate their duties towards its creditors and customers, the public and the stockholders.

The claim of the first, is the more sacred : for unless justice be done to these, the public has a right to no advantage and the stockholders to no profit.

The direction binds not any of its members, nor any stockholder, nor the property of either, beyond that which is invested in the stock, for the payment of the notes put in

74

EASTERN DIST.
*April*, 1832.

PERCY ET AL.
*vs.*
MILLAUDON
ET AL.

circulation, for the return of money received in deposite, or the paper taken in collection. It pledges *only* the capital and funds of the corporation. To create a debt, is to incur the obligation of paying it, and this implies that of preserving the means of doing so, if the debtor possess them ; to acquire them, if he do not. The reduction of these means, being a partial destruction of them, to the injury of the creditors, is irreconcilable with this obligation, the violation of which, acquires an additional degree of turpitude, when the creditor leaves the pledge in the power of the pledgor.

Banks are not incorporated for the sole purpose of enabling capitalists to employ their money advantageously. If they be, the legislature does a great injury to the rest of the community, by suffering such men, in any case, to throw off upon their neighbors, a part of the loss, attending the employment of their funds, while they exclusively, and in every instance, pocket all the profits resulting therefrom, by granting them the privilege, in case of the insolvency of their agents, of being paid by preference to other creditors. *Code of* 1808, *p.* 356, *art.* 25. As some consideration for this immunity and privilege, most bank charters contain a stipulation, that a certain capital shall be employed in some manner, advantageous to the public, as in the language of the charter of the Louisiana Planters' Bank, "in the *extension* of *commerce,* and *the encouragement of agriculture.*" The public had therefore, a right to enjoy the whole advantages stipulated for by the legislature, and could not be legally deprived of any part of them, by the reduction of the capital.

As the claim of the public for these advantages, is subordinate, as we have seen, to that of the creditors and customers of the bank, so is that of the stockholders, for profits, subordinate to that of the public.

The stockholders have a right to expect, that after the creditors and customers of the corporation are satisfied, and the public has enjoyed the advantages stipulated for in its favor, by the legislature, the money invested by them respectively, in the capital of the bank, may be restored to them with such profits as may have been made.

EASTERN DIST.
*April*, 1832.

PERCY ET AL.
*vs.*
MILLAUDON
ET AL.

The reduction of the capital, by subjecting the shares of the remaining stockholders to a greater portion of the debts of the bank, than they had agreed to be bound for, works an injury to them respectively.  Each had a right, which he had exercised at the time of his subscription, or of his purchase of stock, to determine what stake he should hold in the affairs of the corporation, particularly what part of its passive debts, the funds he invested would be liable for.   This he had a right of increasing and diminishing at pleasure by the purchase or sale of shares; of this right he has reserved to himself the exclusive exercise, and nothing authorised the direction to interfere therein.   In reducing the capital from six hundred thousand dollars to two hundred thousand, it increased the responsibility of each remaining stockholder threefold.

Before the resolution of third of April, 1819, no share appears to have been purchased except as a matter of profit, for they were always purchased on a discount.   From the date of that resolution till the twenty-ninth of June, 1819, no share was purchased.   From this date to the first of October following, two hundred and ninety-three shares were transferred.   From this last day, which was that of the dividend, five hundred shares were purchased, making in the whole seven hundred and ninety-three shares purchased under the resolution.   Every one of these shares was purchased from the president, a director, the cashier, or some person, whose agent one of these persons was, or between whom and one of these there existed an intimate connection.   The last five hundred shares were furnished, one-half by the president and cashier, and the other half by the appellees, Millaudon and Lanna.

The appellants' counsel has presented to us the withdrawal of one hundred and fifty thousand six hundred dollars, the price of these six hundred and fifty-three shares almost exclusively by the president, cashier, and the appellees Millaudon and Lanna, and without any exception by members of the board, persons whose agents they were or with whom they had the most close connection, not only as an illegal, but as

EASTERN DIST.
*April,* 1832.

PERCY ET AL.
*vs.*
MILLAUDON
ET AL,

a fraudulent and corrupt act, and a conclusive evidence of the collusion between the president and these appellees which brought on the ruin of the bank.

The counsel has contended that the use which was made of this resolution is the best evidence of the motive of those who proposed and supported it.

The counsel has urged that the fact of money being scarce when the resolution was passed, is assigned in its preamble as the reason of its adoption ; and it is in evidence that the price of money ranged from twelve to eighteen per centum.

The pecuniary distress of the country was heavily felt by the corporation ; and the balance against it, with the other banks of the city, ranged, on the weekly exchange of notes, from one hundred and twenty thousand dollars to one hundred and eighty thousand dollars ; so that it was unable to pay its notes to these banks, the direction of which were alarmed and communicated their apprehensions to the board of the Planters' Bank.    That the president, who during the period of about one year and a quarter immediately following the resolution, had refrained from acting under it, should on the twenty-ninth of June following, when the crisis approached its highest pitch, begin to transfer part of his own shares, and purchase others from other directors and the cashier to the amount of fifty-eight thousand dollars ; and that during the first fifteen days of October, after the dividend was paid, on the first of that month, he should have disbursed one hundred thousand dollars for this purpose, taking one-half of this last sum for himself and the cashier, paying the other half to the appellees Millaudon and Lanna, are circumstances which credulity itself cannot well attribute to a consciousness that he acted for the benefit of the institution on which he presided.

The counsel has contended that if there is the most violent presumption, and that it is proved by the testimony of the cashier's son, introduced by the appellees themselves, that the payment of the one hundred thousand dollars was effected on the same day, the fifteenth of October, 1819, the eve of the cashier's disappearance, although the transfer book shows

EASTERN DIST.
*April,* 1832.

PERCY ET AL.
*vs.*
MILLAUDON
ET AL.

operations on different days previous thereto; that the exact division of what he denominates this plunder, by equal proportion between four individuals, is evidence of the collusion and concert that existed between them.

It is unnecessary this tribunal should affix to this transaction the character of corruption or fraud; the court is bound to say that these transfers were illegal, and when they have done so, the conclusion that they are null and void, and that the money paid on them constituted those who received it, the debtors of the institution to its full extent.

IV. A fourth charge relates to a false report made to the board, by these three appellees, who had been appointed a committee to inquire into the state of the vault, after the disappearance of the cashier. It is shown they reported all was perfectly correct, although there was an evident deficiency of coin of about fifty thousand dollars, and other manifest irregularities had been discovered; but it is in evidence that all the other directors accompanied and assisted the committee in their investigation, and it is clear no member of the board was deceived by this report, which it was deemed prudent to make in order to conceal circumstances, which had they come to the knowledge of the public might have considerably affected the credit of the institution. The counsel of the appellants has not urged that this report was, in any of its consequences productive of any detriment to the bank.

The mischief was done, and except as far as may appear in the examination of the following charges, the appellees unaffectedly and zealously labored with the other directors in lessening as much as could be done, the consequences of the misconduct of the president and cashier, which does not appear to have been discovered before.

V. Immediately after the false report was made to the board, the appellee Lanna (who was the only solvent surety of the cashier, the president being the other,) moved for the discharge of his principal, and the cancelling of his bond, and the motion was carried. The board was then composed of the president, these three appellees and two other directors only, being but the mere legal number of directors, (including

EASTERN DIST.
April, 1832.

PERCY ET AL.
vs.
MILLAUDON
ET AL.

the appellee Lanna,) for any business requiring an act of the direction, except the making of discounts. It was evident that there was no legal *quorum*, as the appellee Lanna and the president, his co-surety, were disabled from giving an unbiassed, legal vote on the motion. This was a most illegal proceeding, but its illegality was not perhaps its only vice. Every director, we have seen, had assisted at the examination of the vault, and the investigation of the affairs of the bank, which took place, as soon as the disappearance of the cashier came to the knowledge of the board, and must have known that the institution had sustained a loss from his misconduct. Of the members present at the board on that day, these three appellees alone are before us ; not having heard the others, it does not become us to, nor is it necessary we should, animadvert on their conduct ; but these appellees having composed the committee for the examination of the vault, their knowledge of the existing deficiency is so forcibly brought home to them, that the transaction does not appear to us free from collusion.

*Directors apprehensive of a suit from the stockholders, could not legally appropriate money of the bank to the fee of counsel.*

VI. A sixth charge rests on allowances, alleged to have been made illegally and fraudulently to the cashier and attorney of the bank : that to the first has not appeared to us illegal or fraudulent, but the latter was evidently so. The directors were apprehensive that some of the stockholders, dissatisfied with their conduct, intended to subject it to a legal investigation. A resolution of the board directed the payment of one thousand dollars to the attorney, as a fee for the defence of the directors, if the suit was instituted. The appellees Millaudon and Lanna were present, when this resolution was agreed to. Although no suit was brought, the money was paid.

VII. The last charge relates to the neglect of these appellees to pay the amount of several shares subscribed for by them, and to collect that of other shares subscribed for by others. The evidence does not enable us to say that this charge is proved.

The counsel for the appellee Lanna, towards the close of the argument, filed a plea of the prescription of one year

against actions resulting from offences and *quasi* offences.
*Civil Code,* 2501.

The counsel of the appellants opposed the filing of this
plea, and cited the *Code of Practice,* 890, 897, 886.

It is true the Code of Practice requires the appellee to file
his answer, within three days after the time allowed him for
his appearance, but permits him to file it three days before
the day of the argument, if he prays for the affirmance of the
judgment and costs only; but the Civil Code provides that
prescription may be pleaded, *in every stage of the cause,* even
on the appeal, but it ought to be pleaded specially and
expressly *before* the final judgment.   *Article* 3427.

<div style="float:right; font-style:italic; text-align:left;">Prescription<br>may be pleaded<br>in the Supreme<br>Court at any time<br>before final judg-<br>ment,</div>

The *general* provision for answer does not, in our opinion,
repeal the *special* one for the plea of prescription.   *Curia*
*Philipica, cession* 5, *l.* 3, *ubi gloss de silent.*

On the merits of this plea, the suit is brought for a liqui-
dation and settlement of accounts, a division and partition of
the net proceeds.    It is an action *ex contractu* against manda-
taries, and not one *ex delictu.*

The opinion, we have formed, that although no one act of
these appellees particularly renders them liable for the loss of
the stock, because to none of these acts, individually, can the
ruin of the bank be attributed; yet as all the acts which are the
basis of the charges which the appellants have established,
contributed to prepare the way, and finally produced the fatal
result, necessarily leads us to the conclusion that they are
responsible : neither can they escape from the consequences
of these illegal acts, by the allegation that they could not
have produced any serious injury to the institution, if the
president and cashier had acted correctly.    The appellants
have replied with the same truth, but more force, that the
misconduct of these officers could not have produced the fatal
result, if the board by the reduction of the stock and the
unlimited power given to the president, had not disabled the
institution from withstanding any serious loss.    These appel-
lees are respectively chargeable for the amount of the stock
illegally transferred by them respectively, and the appellee

<div style="float:right; font-style:italic; text-align:left;">Directors of a<br>bank are person-<br>ally responsible<br>for damages re-<br>sulting to the<br>bank from their<br>acts or neglect,<br>and the measure<br>of damages is the<br>extent of the in-<br>jury.</div>

EASTERN DIST.
April, 1832.

PERCY ET AL.
vs.
MILLAUDON
ET AL.

Lanna is also chargeable with the amount for which he was bound as the surety of the cashier.

These transfers and the cancelling of the bond, as to Lanna particularly, are the only illegal practices of these three appellees in their private capacities, which the appellants have established; as to all the other charges, which have been established against these appellees they are only so in their official capacities, as members of the direction. The evidence does not enable us to say that the appellants have established, against any of these appellees any important charge, which is to be fixed upon these three appellees or any of them exclusively, other than those above stated.

The principal of the charges against them, as members of the board, are the irregular discount and the reduction of the capital.

As we have already observed, the illegal diversion of a very considerable portion of the funds of the bank, from its regular and legitimate channel, almost to the exclusive advantage of the president, these three appellees and a few other directors, and the subsequent reduction of the capital, are the two immediate causes of the inability of the corporation to continue its operations, after the severe shocks it received from the misconduct of the president and cashier.

The usurious discounts to which the board resorted, as a mere momentary palliative, hastened the period when it was compelled to close its doors, and the losses attending the final liquidation of the concerns of the institution absolutely beggared it. Although it cannot be denied that the ordinary means in the power of a director might not have enabled him for a very long time to discover the collusion between the principal officers of the bank, yet, the appellees, in common with the other members of the board, must have had frequent opportunities to discover the improper use the president made of the trust which had been placed in him, from the very moment he entered on the discharge of it. Common decency ought to have restrained him from discounting his own paper. The discretion, which he was invested with to make discounts, could not properly be exercised by him, in cases in

EASTERN DIST.
*April,* 1832.

PERCY ET AL.
*vs.*
MILLAUDON
ET AL.

which his own interest was adverse to that of the bank. Yet he went on, taking for himself one-half of the money disbursed in the payment of notes, which he discounted, with the aid of the directors he called in as his advisers.

The counsel of the appellants has drawn our attention to appointments made at times, of these appellees, as the committee of investigation, which precludes the idea that they could be ignorant of the president's conduct in this respect. Of the same kind was the conduct of that officer, in the exercise of the authority committed to him to purchase shares. For, at several times, he purchased his own shares, and the last operation of the kind, was the purchase of one hundred thousand dollars of stock, one-half of which, he bought from himself, and the great advantages which these two appellees derived from their illegal discounts and transfers, has been pressed on us, as very strong presumption, of an understanding between them and the officer. We cannot, however, resist the impression, that as these appellees and the president, could not alone, have caused the resolutions under which these discounts and transfers were made, if the other members of the board, had used ordinary vigilance and attention, the mischief that resulted from them could have been averted.

We conclude, that the evidence on record establishes, that the ruin of the bank, is owing to the mismanagement of its affairs, by the board of directors, during the years 1817, 1818 and 1819.

The protection which directors of banks, like all other mandataries, are entitled to, whilst acting honestly, in the discharge of their duties, has been strongly pressed on us. We gave considerable attention to this part of the defence, when it was first before us, and we expressed our ideas on this point very fully. The view, which we then took of this subject, is still thought to be correct.

Mandataries or agents, are not responsible for an error in judgment, when duty compels them to choose between difficulties, and the case is one, in which doubt may reasonably be said to exist, and it is hard to say, which is the safe course.

In Louisiana they are responsible for their *virile* share only, and not *in solido,* but they are not responsible for an error of judgment when duty compels them to choose between difficulties and the case is one in which doubts may be reasonably said to exist. But when the error is gross, the necessity not apparent, and the consequences fatal, they are answerable.

75

EASTERN DIST.
*April,* 1832.

PERCY ET AL.
*vs.*
MILLAUDON
ET AL.

But when the error is gross, the necessity for the act not apparent, and the consequences fatal, they must be held responsible, or the principal be left without protection ; such was the case, as to the facts on which the first and third charges rest. Men of good sense, who had taken time to reflect, could have hardly come to the conclusion, that the board had the power of placing the funds of the bank, at the discretion of the president, or to reduce the capital, so as to increase the responsibility of the remaining stockholders, threefold.

The Supreme Court of the United States, has carried this doctrine so far, as to declare that a cashier, whose duty was to act under the control of the board, could not protect himself, from the consequences of an illegal act, by pleading its authority or assent. The loss in that case, arose from a practice, in which customers had been indulged to overdraw. Such an usage or practice, said the court, is surely a manifest departure from duty, both in the directors and cashier, which cannot receive any countenance in a court of justice. 1. *Peters,* 72.

The responsibility of these appellees, being thus established, the next question is, as to its measure, and we think, it ought to be the extent of the injury sustained by the appellants.

The prayer of the petition is, that the moneys alleged to be due, may be brought into court and a general settlement made ; that the creditors of the bank, may receive what is due to them, and that the balance may be distributed among the stockholders. That prayer, according to the view taken by the appellants, was correct ; but the evidence and law, in our opinion, render it impossible effectually to carry into effect, in this suit, this prayer for a general settlement. We must therefore, content ourselves, to provide for the payment of the debts, and do justice to the appellants, under their prayer for general relief.

The appellees must, therefore, be decreed respectively to bring into court, the several sums of money for which they are respectively chargeable in their private capacities, viz :

EASTERN DIST.
*April*, 1832.

PERCY ET AL.
*vs.*
MILLAUDON,
ET AL.

The appellee Lanna, as surety of the cashier, $15,000

Do.    for 170 shares, to be by him re-
sumed,....................................................... 34,000

$49,000

The appellee Millaudon, for 125 shares,........... 25,000

The appellee Abat, for four shares,.................. 800

$74,800

Out of which, there is to be retained in court
for the creditors of the bank, according to a
schedule filed,............................................. 44,418 95

$30,381 05

This balance is to be distributed among all the appellants and appellees, without distinction whatever, a *pro rata* of their respective number of shares, according to the schedule on file, i. e. seven hundred and seventy-seven shares, as stated in the beginning of this decree, increased by one hundred and seventy shares resumed, as above stated, by the appellee Lanna, one hundred and twenty-five by the appellee Millaudon, four by the appellee Abat, in all one thousand seventy-six shares, i. e. twenty-eight dollars and twenty-three and one-half cents per share.

The amount, thus to be received by the appellants, is to be accounted for, in deduction of the damages they are entitled to.

We have said, the measure of these damages, is the extent of the injury sustained, or in other words, what it is most probable they would have received, had the concerns of the bank been properly managed.

We assume, they would have received the amount of
the original cost of the share,.......................................$200

And the dividends, during the seven and a half years, which have elapsed, between the declaration of the last dividend, October 1, 1819, and the expiration of the charter, April 1, 1826, at the same rate as before, i. e. ten per cent. during seven and a half years, twenty dollars a share,...................................... .................... 150

$350

EASTERN DIST.
April, 1832.

PERCY ET AL.
vs.
MILLAUDON
ET AL,

The appellants' counsel has contended, that for these damages, the appellees are jointly and severally liable ; while on their part, it has been insisted, that if any liability exists, it is only for one-eleventh part for each appellee, or his virile share, as member of a board of eleven directors.

As the ground of the opinion we have formed on this point, is a positive provision of our code, it would be unprofitable to follow counsel through the immense mass of authorities, which they have laid before us. A short statement, however, rather historical than critical, of the state of the law, previous to the enactment in our code, will render the question easier to be understood, and furnish reasons of great weight, for the conclusion we came to.

An examination of the question will place in a remarkable point of view, the difference between the law as written and expounded. Going back to the first legislation on this respect, it would seem that there had been something like a conflict between the legislator and the jurist.

In the early days of Roman jurisprudence, it was, we believe, the law that a joint obligation produced a joint and several responsibility ; the institutes, 3, 17, seem to establish the general rule, and in the Digest, *mandati vel contra*, 60, §2, an express application of it is made to the contract of mandate.

At a late period, we find the novel 99, which declares that solidarity is not presumed. This latter law, the greatest number of the continental jurists thought did not apply to mandataries, and more particularly those who were appointed by the courts. As, however, the laws of Spain were in force, in this country at the period the transaction under consideration took place, the jurisprudence of that kingdom is particularly to be noticed. A positive statute there declares that if two persons bind themselves simply by a contract, or in any other manner whatsoever, to give or do any thing, it is thereby to be understood that each of them is bound for one-half, unless it be said in the contract, that each is bound in *solidum*, or in any manner it was agreed upon otherwise, and this notwithstanding any provision of the civil law *derecho romun* to the contrary.

Eastern Dist.
*April*, 1832.

PERCY ET AL,
*vs.*
MILLAUDON
ET AL.

Nothing can be more explicit than this enactment; it seems evidently intended, indeed it is so expressed, to correct the doctrine of the Roman laws; and as the jurists had declared that the law of the novel was to be confined to joint debtors, it provides for contracts and *quasi* contract, for contracts to do any thing else than pay money.

An enactment so broad and comprehensive and marking so obviously the intention of the legislator, one might think would have received an interpretation, corresponding to the spirit in which it was made; but this was not the case. The jurisconsults determined that the law made no change in the jurisprudence, except as to sureties.

The appellees' counsel has, we think, fully established the fact. How jurists so limited it, and how with this principle, they suffered it to apply to joint debtors, is not very plain.

The opinion was not, however, universal. There were some, who thought that the law had a more extensive application, and that it could not be entirely destroyed by construction and interpretation. Rodriguez informs us, that the Roman law *Duobus quis mandavit*, relied on by Pothier to support his opinion, is not in force in Spain, and declares that mandataries in that country, are not responsible *in solidum*, unless it be expressed; but even he, is unwilling to let the law pass, without exhibiting his authority over it. He says, this must be understood when they are all solvent, for if any one be not, the rest must be responsible. Where he got the rule we know not, and how he reconciles it with the construction he gives to the law, we cannot discover. For if each is bound for his part only, unless solidarity be expressed, how one may be rendered responsible for the part of the other, is inexplicable.

The author of Curia Philipica, than whom we believe a sounder writer, and one less ambitious of fanciful distinction is not to be found in Spanish jurisprudence, says:

"*Siendo dos, ó mas factores ó mandatarios, cada uno es obligado por su administracion, y no mas. Y assi, si á cada uno es concedida la administracion in solidum, cada uno de ellos queda obligado por*

EASTERN DIST.
April, 1832.

PERCY ET AL.
vs.
MILLAUDON
ET AL.

*ella por el todo, conforme un texto ; mas si no le es concedida in solidum qualquiera de ellos obligo solo por su parte, segun, derecho."*  *Factores,* 37.

The writer contemplates the case of a division of powers in the second part of the paragraph, and declares each is responsible for his administration ; a doctrine very clear and obviously correct, where the principal has assigned separate duties to his agents ; he then proceeds to say that if the administration be granted in *solidum,* each is bound for the whole according to a text, and if it be not in *solidum,* each is obliged for his part.   The true meaning of his language has been the subject of much debate at the bar ; but whether we take the expression in *solidum* as a joint and several power, or a power to one to do or perform the mandate, the result in the end would be the same ; for there was no power conferred in *solidum* on any part of the directors to transact business, contrary to the wishes of the others.   All had the right to attend and see the affairs correctly conducted.   On this part of the subject it is not necessary, however, to express our opinion, as our code, we believe, has settled the question : "*An obligation in solido is not presumed ; it must be expressly stipulated,* 278 and 102.   *The rule ceases to prevail only in cases where an obligation in solido takes place of right by virtue of some provision of law.*"

Had the legislature stopped there, it would of course be a subject of controversy, whether in a joint power of attorney solidarity did not take place, and the subject would be as fruitful of argument as at any period of the law.   But to prevent any misconception on this point, the legislature has been careful to say that a joint mandate is not one of the cases in which solidarity takes place by virtue of law.   The English text of the 29th article, page 244, it is admitted, at all hands, is void of sense and meaning, and the French text must be referred to.   It declares that when there are several attorneys appointed by the same act, they are not bound *in solido,* for what each one has done, if the solidarity be not expressed, in the power of attorney.

Now we believe it to be really difficult to negative the idea
that solidarity results from any joint power, by clearer lan-
guage than is here used ; and unless there be something in
the doctrine of mandate, which renders it impossible for
legislative authority to protect agents from a several and
joint responsibility, we think they are no longer so respon-
sible. All other arguments, addressed on the solidarity
springing from the nature of the acts to be done, are in con-
tradiction of the article which provides that there shall be no
solidarity, unless it be expressed in the mandate.

Since the Napoleon Code, which contains a provision
nearly similar to our own, was promulgated, the article has
been much commented on in France, and the late writers do
not agree in its interpretation. The Court of Cassation has
decided that it does not destroy solidarity, in cases in which
the agents are appointed by the court as provisional syndics
of a bankrupt. Toullier, after, quoting the Roman law, says
the Napoleon Code has abrogated the conjoint solidatary of
mandataries. *Vol.* 2, 60, *N.* 18. Merlin adopts the doctrine
that the contract of mandate includes an indivisible obli-
gation on the part of the mandataries, and concludes their
responsibility would be *in solido* were it not for the 1995th
article of the Code.

The question appears to us, to narrow itself, and is only
whether the mandate of bank directors, be a legal or a conven-
tional one.

In one point of view, the mandate is certainly conferred by
the law, i. e. by virtue of the charter. But if that were
sufficient, solidarity would attend every mandate, for all
mandataries do, or ought to exercise their duties, under the
law which authorises their appointment and defines their
responsibility. The marked difference between the manda-
taries appointed under a law, in whose nominations the
principals or party concerned, have no agency, and the case
before us is, that there is no appointment by authority of
justice. It is one made by a company of men, associated for
the purpose of banking. They had a right to make their
charter as they pleased, and to have imposed any obligation
on their agents and officers, which they thought proper, and

EASTERN DIST.
April, 1832.

PERCY ET AL.
vs.
MILLAUDON
ET AL.

if the legislature thought proper to refuse them a charter, they could have declined becoming stockholders. We cannot see, how it is possible to distinguish the case from that of a private company, in whose articles of partnership, it was insisted that certain members of the firm, should be chosen in each year, to conduct its affairs. The persons so appointed would not be responsible in *solido*, unless the solidarity was expressed. The circumstance of the members of the firm, going to the legisla- ture and obtaining a charter, which might protect private property from partnership debts, could not increase the responsibility of the agents. The character of the association of the members, was not changed by the charter of the Louisiana Planters' Bank. The directors are still the agents of the stockholders. The association was formed by virtue of a convention, and under this convention directors were appointed, but on the terms of partnership, on which the incorporated company, agreed to transact business, we have no more reason to believe, the legislature intended to make the directors responsible in *solido*, than we have to believe, they intended to increase the responsibility of the cashier and clerks, beyond what had been contemplated in the original articles of association.

It has been said, that the principal reason given in the books, why mandataries are protected from a joint and several responsibility in the Napoleon Code, is, that the principal may impose it in the act, and if he do not, the presumption is, he cared not for it, but in the case of directors, stockholders have not the opportunity of imposing the burden. We need not inquire, whether the reasoning be sound or not, for admitting it to be correct, the conclusion drawn from it is illegal.

Doubtless, the stockholders could not alter the charter, but nothing prevented their having it made so as to provide for the solidarity, or to refuse to accept it without. If the charter is to be considered as the mandate, and it no doubt is, that the charter should have expressed the responsibility; otherwise, in the language of the law, it cannot be presumed.

The appellants, Foucher and Landreaux, having been members of the board, the first, till the middle of September,

EASTERN DIST.
*April*, 1832.

PERCY ET AL.
*vs.*
MILLAUDON
ET AL.

1819, the second, till December, 1818, must necessarily be excluded from recovery. The first is owner of forty-five shares, the second of nineteen; and thus the shares of the appellants, who are entitled to recover all reduced to three hundred and forty-nine.

It is, therefore, ordered, adjudged and decreed, that the judgment of the District Court be annulled, avoided and reversed.

We have said, that the appellants and appellees are entitled to twenty-eight dollars and twenty-three and one-half cents, upon every share by them respectively holden, out of the seventy-four thousand eight hundred dollars, to be paid by the principal appellees ; this leaves a balance of three hundred and twenty-one dollars and seventy-six and one-half cents on every share, to complete three hundred and fifty dollars, the amount of damages. On this score, the appellants (excluding Foucher and Landreaux,) being the owners of three hundred and sixty-nine shares, are entitled to one hundred and twelve thousand two hundred and ninety-five dollars and ninety-two cents ; for one-eleventh part of which, each of the principal appellees is liable, i. e. ten thousand two hundred and eight dollars and seventy-two and one-half cents.

Proceeding, therefore, to give such a judgment, as in our opinion, ought to have been given below, it is ordered, adjudged and decreed, that there be judgment against the appellee Lanna, for fifty-nine thousand two hundred and sixty-eight dollars and seventy two and one-half cents ; against the appellee Millaudon, for thirty-five thousand two hundred and eight dollars and seventy-two and one-half cents; and against the appellee Abat, for eleven thousand and eight dollars and seventy-two and one-half a cents.

Out of these several sums, when collected by the sheriff, he is to pay to these appellants, in proportion to the number of shares by them held, according to the schedule on the record, thirty thousand six hundred and twenty-six dollars and seventeen and one-half cents, being the three eleventh parts of the

76

EASTERN DIST.
*April*, 1832.

PERCY ET AL.
*vs.*
MILLAUDON
ET AL.

damages to be paid by these three principal appellees, or ten thousand two hundred and eight dollars and seventy-two and a half cents each; the appellants Foucher and Landreaux not being included in the distribution; and the balance he is to bring into court, subject to distribution, according to the manner heretofore prescribed.

But in case of inability of the sheriff to collect from any one or two of these appellees, his or their proportion or proportions of the sum of seventy-four thousand eight hundred dollars, with which they stand charged, each for his respective portion, on account of advantages by them respectively obtained, it is ordered, adjudged and decreed, that one-eleventh part of the deficiency be collected from the other, or each of the others, as the case may be.

And it is ordered, that the appellees pay costs in both courts.

*Hennen* and *Barton*, for the appellants.
*Grymes, Canon* and *Mazureau*, for the appellees.